267 P.2d 896

In re WALTERS' ESTATE.

WALTERS  v.  WALTERS et al.
No. 5732.

Supreme Court of Arizona.
March 15, 1954.

Frank J. Barry, Jr., Tucson, and Lawrence M. Cahill, Los Angeles, Cal., for appellant.

Wesley E. Polley, Bisbee, for appellees.

DONOFRIO, Superior Court Judge.

This is an appeal from a judgment denying probate to the will of Elias Meers Walters on the ground of his testamentary incapacity. The decedent was grievously injured in an accident on October 14, 1951, on his ranch near Willcox, Arizona, which resulted in his death the following day. He left surviving three grown children and a divorced wife who was not the mother of the children.

A few hours after the accident he made a will leaving the bulk of his estate to his son, the appellant, John Robert Walters, with bequests of $100 each to his other two children Laura and Walter and to his ex-wife, Katherine. Petition was filed for the probate of the will and his children Laura

Erma Heinemann and Walter O. Walters timely filed their contest on the grounds of testamentary incapacity. Appellant filed an answer denying the contention set out in the contest. Trial was had before a jury on the sole issue of testamentary capacity, and the jury returned its verdict finding the deceased was not of sound mind at the time of the making of the will. Motion for judgment notwithstanding the verdict was denied, and a judgment entered in accordance with the findings of the jury.

The only question to be determined by this appeal is whether the evidence is legally sufficient to support the verdict.

With the exception of the witness Dr. P. Paul Zinn, whose testimony will be treated separately, the evidence without contradiction, in substance shows the following facts: The decedent was a man 67 years of age and solely operated a ranch at Pearce, Arizona. His children were all over the age of 30 years and living in California on the day the will was made.

On Sunday, October 14, 1951 he was operating a mechanical hay-baler in a field on his ranch. While attempting to adjust some string, his right hand was caught between two rollers and his arm and shoulder were carried into the machine and severely crushed and mangled. He was later discovered by a neighbor who summoned help and called Dr. William F. Havemeyer of Willcox. It took them an hour to extricate him. Decedent was suffering from shock and pain but was of sound mind and answered questions with clarity. At this point Dr. Havemeyer gave Walters an intravenous injection of one-sixth grain of morphine sulfate and had him removed to the Willcox Municipal Hospital. On arrival he was able to stand for a moment while being put on a stretcher. In the hospital intravenous injections were commenced, including blood, plasma, dextrose and saline. Shortly after his arrival he was given 100 mg. of demerol in the vein to relieve pain. Shortly after his arrival at the hospital and before making his will, Walters asked a friend to go to the ranch and get his purse, telling him "just where to find it", and asking him to notify a neighbor of the accident.

About an hour after his arrival, Walters inquired about making a will, and Dr. Havemeyer advised him that he ought to make a will if he desired. A lawyer was not available, and Hospital Superintendent R. V. Rawlinson offered to take down the words as Walters dictated. After writing five lines, Rawlinson read them back and Walters made some corrections and then resumed dictating until the will was finished. The entire instrument as corrected was read back and Walters signed it with his left hand with the assistance of Rawlinson and a nurse. Nurses Sanchez, Belcher, Watson, and Flick were present during the making of the will and all but Nurse Flick signed as witnesses. The context and form of the will meets all legal requirements. It is to be noted that testator's daughter's

name Laura Heinemann was spelled as Laura Heineman in the will.

After the execution of the will decedent asked that a friend, Mr. Paul Duncan, be summoned; he shortly appeared and Walters asked him to examine the will he had made and see if it was all right. The friend later secured an attorney who drew a more formal will but Walters was too weak by that time to understand or sign the instrument. Walters was thereafter removed to a Tucson hospital where he died the morning of October 15th.

All of the witnesses present before and at the making of the will testified without contradiction that decedent was of sound mind at the time. Mr. Rawlinson's testimony was to the effect testator was completely coherent, conscious and rational, and that he was of sound mind. He further testified that his mental condition was good until he began to sink after he had talked to Mr. Duncan, which was after the execution of the will.

The nurses and hospital employees, Earlene Belcher, Mercedes Sanchez and Elizabeth Watson, who witnessed the will and were present during its execution, stated in effect the same, that testator was conscious, mentally alert and of sound mind at all times.

■ Bearing in mind these facts, let us analyze the law governing will contests: The burden of proof is on the contestants to prove by a preponderance of the evidence that the will is invalid. When the claimed invalidity is alleged to be the testator's incompetency, the contestants must produce sufficient evidence to rebut the presumption of testamentary capacity. In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063; In re Greene's Estate, 40 Ariz. 274, 11 P.2d 947; In re Perkins' Estate, 195 Cal. 699, 235 P. 45.

■ The policy of the law favors testacy, In re O'Connor's Estate, supra, and this policy would be defeated if wills were lightly set aside. Hence it is the duty of a court carefully to scrutinize a verdict finding a will invalid and to set aside such a verdict where it appears the evidence is not clearly sufficient to support it. In re Morey's Estate, 147 Cal. 495, 82 P. 57. In In re Smith's Estate, 53 Ariz. 505, 91 P.2d 254, 255, Justice Lockwood, speaking for this court stated:

"* * * No matter how much we may reprobate the conduct of a testator from the standpoint of natural justice, or even of humanity, we may not on that account permit his will to be set aside unless it *clearly* appears that he did not fully realize what he was doing with his property, for it is his to dispose of as he pleases." (Italics ours.)

■■ Nor can the evidence for the contestants be examined in a vacuum. As was pointed in the O'Connor case, supra, where the evidence surrounding the making of the will indicated that the testatrix knew what she was doing, such evidence, where it is

uncontradicted, cannot be wholly disregarded by a jury and a verdict returned based on flimsy and inconclusive evidence which does not clearly establish a lack of testamentary capacity at the very instant the will was made. In applying this principle to the case at bar, we see that all the witnesses who saw the testator prior to and at the time of the execution of the will state he was of sound mind. True, the evidence does show that in the events occurring shortly after the will was signed his consciousness began to wane, but what relation has this latter evidence to the issues in this cause? Mental condition at a time other than the time of the making of the will does not affect the validity of the will. If a testator was competent to make his will when it was executed, the fact that he later became incompetent is of no importance except in so far as it tends to show mental condition at the time of the execution of the will. In re O'Connor's Estate, supra.

In view of the fact that all of the witnesses at the execution of the will and prior thereto testified to testator's competency, together with the fact he was suffering from irreversible shock, and getting progressively worse due to his injury, there is no logical relation between the fact that he was later in a stupor or unconscious, and the issue of mental capacity at the time of the making of the will. Such evidence, therefore, has no probative value on the material issues, and is not entitled to be given any weight.

Appellants urge as evidence of testamentary incapacity, that shortly after the signature was placed upon the will Walters was asked by Rawlinson if he didn't want his family notified, and Walters answered by saying he didn't have a family. On this point it is perfectly clear that when he made his will he not only remembered he had a family but named each one of them as beneficiaries under its terms.

As to the evidence of misspelling his daughter's married name Heinemann without the extra "n", we cannot see this indicates any unsoundness of mind, or is to be treated differently from the above evidence.

The evidence which presents the most difficulty properly to analyze and determine whether it raises a conflict upon which the judgment can be sustained, it that given by Dr. P. Paul Zinn. Dr. Zinn, not previously knowing any of the parties or facts in the case, was called as an expert witness. He did not know and had never seen the decedent. His evidence, therefore, is opinion evidence and of necessity must be based on hypothetical questions, some of which embodied the asserted conflicting evidence previously discussed.

After considering the whole of Dr. Zinn's testimony, we find that the total effect of it favoring contestants is that in his opinion the testator who had suffered the injuries, loss of blood, pain and shock enumerated, and who had been administered $\frac{1}{6}$ grain of morphine sulfate and 100 mgs. of demerol during the interim could not have been com-

petent to execute the will; that is, that in his experience medically such a person would not be compos mentis.

In order to set out the predicate for his opinion it becomes necessary to quote a portion of his testimony. Before doing so, it is to be noted that the doctor, after assuming the facts of the accident, stated that decedent in his opinion would be in a state of irreversible shock two or three hours after the accident. In answer to what effect this would have on a person's ability to use his mental faculties, he stated:

"A. Well, in your—following your line of the shock, of course, through this mangle case, you would have a loss of blood as well as pain. The shock itself is the diminishing of the blood supply of the veinous circulation on its return to the heart. Your organs become congested, the skin gets pale, and when this happens you develop a toxin that is generally uncontrollable after it gets started, and the pulse is weak. They get into perspiration, the muscles lose their tone, the mentality is fogged, and their power of reasoning is considerably disturbed to the point where they really don't know what they are doing.

"Q. Now, Doctor, I want you to assume further facts. I want you to assume that this same man reached the hospital approximately an hour after the accident and was given 100 mg's of demerol through the veins together with 2000 cc of dextrose and saline, plus oxygen, plus 400 cc of blood and plasma, and approximately one and a half hours later was given another dose of 50 mg of demerol through the veins. Assume further that this man then, within an hour, attempted to make a will. Now, in your opinion did this man have the mental capacity to know and realize what he was doing at the time he made the will? A. I would say he didn't. It would be my experience."

From the foregoing the doctor has included in his hypothetical statement of facts certain evidence of symptoms characteristic of persons suffering from irreversible shock such as development of toxin, weakness of pulse, loss of tone in muscle, and flagging of mentality which is not borne out by any direct evidence in the case. On the contrary, Dr. Havemeyer, who at all times attended the patient and was with him when he began dictating his will, testified that he was mentally alert. To use his words, he was "preeminently clear and competent".

It is to be noted also that the hypothetical questions eliciting Dr. Zinn's answer failed to include the uncontradicted facts of testator calling for certain things to be done for him which required presence of mind to request, and failed to take into account the uncontradicted testimony concerning his actions in dictating and executing the will.

The importance of including these facts for a proper opinion is borne out by the

witness' own testimony on cross-examination when he was asked to assume the facts that the patient had dictated the will in question, and asked if after assuming these facts would he be able to determine if the patient was of sound mind at the time of the execution of his will, and his answer was:

"Well, you couldn't hardly express an opinion on that unless you were there, because even that in itself shows that either there are some words put in or the man had a lot of coaching, because here with as much demerol as he had, I don't believe that anybody could use that kind of language."

Since Dr. Zinn did not know the testator during his lifetime or treat him during his injury, his opinion of Walters' mental condition when the will was made must be based on the hypothetical questions propounded to him. If these questions did not accurately and completely state the facts, Dr. Zinn's opinion would have no relevancy to the case at bar. As was said by the court in In re Gould's Estate, 188 Cal. 353, 205 P. 457, 462:

"It appears then that no witness has pronouced the testator of unsound mind, whatever may have been the status of the hypothetical man described in the question submitted to the experts. * * *"

In Bickford v. Lawson, 27 Cal.App.2d 416, 428, 81 P.2d 216, 222-223, the court held that unless the hypothetical question is a "full and fair recital of all the essential evidence disclosed by the record on the particular issue" the expert is misled and his answer should be rejected. See also George v. Bekins Van & Storage Co., 33 Cal.2d 834, 205 P.2d 1037; In re Chevallier's Estate, 159 Cal. 161, 113 P. 130, 134; In re Dolbeer's Estate, 149 Cal. 227, 86 P. 695; and In re Clark's Estate, 100 Cal.App. 357, 280 P. 204.

In the instant case the question did not conform to the facts proved and omitted essential elements of the execution of the will which would be of vital importance to a medical expert in reaching his conclusion. The expert's testimony given without the aid of these necessary facts is irreconcilably opposed to the clear and undisputed facts related by all the witnesses who were present, and therefore does not create a conflict on the issue of mental capacity. The abstract opinion of any witness, of the medical or of any other profession, on testamentary capacity is of no probative force when the facts on which it is based are not fully and correctly stated. Loveridge v. Brown, 98 N.J.Eq. 381, 129 A. 131.

Opinions of physicians that the testator was mentally unsound, based in part on the theory that mental unsoundness necessarily results from physical infirmity, is mere subtlety and not expert medical opinion and is no aid to a judicial investigation of the adequacy of the testator's mental capacity. In re Hook's Will, 189 Iowa 287, 178 N.W. 357.

The opinion of experts, answering hypothetical questions which assumed facts not established by any evidence in the cause, and omitted other facts which should have been included, is not entitled to the weight it might otherwise have. Deery v. Hall, 96 Ind.App. 683, 175 N.E. 141; Pendarvis v. Gibb, 328 Ill. 282, 159 N.E. 353.

This court may properly examine the evidence to determine whether it is legally sufficient. Chester v. Chester, 69 Ariz. 104, 210 P.2d 331; In re Greene's Estate, 40 Ariz. 274, 11 P.2d 947. In will contests the evidence must be closely scrutinized by appellate courts because "* * * in will contests more than in any other class of cases are juries wont to render verdicts upon insufficient evidence. * * *" In re Wilson's Estate, 117 Cal. 262, 49 P. 172, 174, 711.

The elements of testamentary capacity are: ability to know the nature and extent of one's property, ability to know the natural objects of one's bounty, and ability to understand the nature of the testamentary act. The cases unanimously support this proposition. In re O'Connor's Estate; In re Greene's Estate; In re Smith's Estate, Arizona cases cited supra. The contestants have the burden of proving that testator lacked this testamentary capacity; that is, they must produce evidence that one or more of the essential elements of testamentary capacity was missing at the instant of execution of the will. This they have failed to do.

For the reasons hereinbefore stated we find no evidence in the record having probative value sufficient to support the judgment of the trial court. The judgment is therefore reversed, with directions to dismiss the contest and admit decedent's will to probate.

PHELPS, C. J., and STANFORD, LA PRADE and UDALL, JJ., concur.

WINDES, J., disqualified, having sat as the trial judge, and the Honorable FRANCIS J. DONOFRIO, Judge of the Superior Court of Maricopa County, was called to sit in his stead.