[S. F. No. 7172.  Department Two.—April 27, 1915.]

In the Matter of the Estate of VICTOR H. WASSERMAN, Deceased.  SOPHIA F. WASSERMAN, Respondent; HORACE C. JONES, Appellant.

WILL—MENTAL CAPACITY OF TESTATOR REQUISITE TO MAKING OF VALID WILL.—In determining the question of the mental capacity requisite to the making of a valid will, the rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld.

ID.—EVIDENCE OF MENTAL INCAPACITY—VERDICT AGAINST WILL.—In this contest of a will, the verdict of the jury against the validity of the will on the ground of the mental incapacity of the deceased by reason of his insanity, is held to be supported by the evidence.

ID.—PROPERTY LEFT TO STRANGER—TESTATOR A SUICIDE.—On such a contest, the fact that the testator left his little property away from his aged mother and from his brothers from whom he had not been estranged was proper for the consideration of the jury, as was also the fact that he met his death at his own hands.

APPEAL from a decree of the Superior Court of the City and County of San Francisco refusing to admit a will to probate, and from an order refusing a new trial.  Marcel E. Cerf, Judge.

The facts are stated in the opinion of the court.

Nowlin, Fassett & Little, for Appellant.

Joseph P. Lucey, for Respondent.

HENSHAW, J.—This is a contest over the admission to probate of the will of Victor H. Wasserman, deceased.  At the time of his death he was forty-five years of age.  He had never married and left surviving him his mother, two brothers, and one sister.  He had been employed as a railway freight clerk in the offices of the Southern Pacific Company, but some time prior to his death was obliged to cease his employment on account of ill health.  He invested his savings in a six-acre tract of land in Santa Clara County and devoted his time to planting this land to orchard trees.  Before his death he was despondent over his lack of money.  In March,

1914, he committed suicide by hanging. His body was found in a barren spot near the reservoir on Twin Peaks in the city and county of San Francisco. While his death was caused by the strangulation of hanging, he had also stabbed himself. In his hat, found alongside his body, was a holographic will in language as follows:

> "San Francisco, Cal.
> "Mar. 9, '14.
> "Being of sound mind, I will my (6 1-5) six and one-fifth acres in Santa Clara County to Horace C. Jones of Berkeley.
> "VICTOR H. WASSERMAN."

Its date was the day preceding the testator's self-destruction. The beneficiary under his will and the proponent thereof, Horace C. Jones, was a friend of the deceased of several years' standing and had been engaged with him in the same general employment in the Southern Pacific Company, had interested himself in the deceased's affairs and made many week-end visits to the deceased's property in Santa Clara County. The deceased was not an infrequent guest at the home and at the table of the proponent.

The contest of this will instituted by the mother of the deceased was based upon the mental incapacity of the deceased to execute a will by reason of his insanity. The issue was tried before a jury which returned its verdict against the validity of the will upon the ground indicated. From the decree which followed and from the order denying his motion for a new trial, Horace C. Jones, the proponent, appeals.

In the consideration of this appeal we have in mind the principles of law and the decisions upon them governing the question of the mental capacity requisite to the making of a valid testamentary disposition of property, such principles as that declared in *Estate of Chevallier*, 159 Cal. 168, [113 Pac. 133], where it is said: "The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld," and the language of *In re Redfield*, 116 Cal. 655, [48 Pac. 799], where this court say: "A man may be of unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to incapacity for a discharge of the important duty of making a final disposal of his property, is

a question which the court must determine upon its own responsibility.''

The contention of the appellant is that while the deceased labored under certain delusions or hallucinations, they were not such, nor of such character, as to impair his capacity to make a will, that the evidence did not establish a general mental unsoundness (as distinguished from the mere indulgence in one or another form of delusion) which was sufficient to justify the jury in its conclusion that there was such a complete breakdown and destruction of the mental faculties as to preclude the idea that the will was the product of a disposing mind.   The following was shown:

There was insanity in the family.  A sister had been confined in the state asylum for the insane at Agnews and had died there.  From the year 1912 the deceased entertained strange beliefs, delusions, and hallucinations; the waiters in the restaurant were endeavoring to poison his coffee; the saloon keepers to poison his beer; wireless electricity was shooting violet rays through him instigated by his enemies; the Southern Pacific Company, his former employer, sought to destroy him; it had detectives pursuing him; the detectives entered his house and stole a can of condensed milk and a can of corn; the Southern Pacific also instructed its engineers to blow off steam as they passed Cupertina (in the neighborhood·of which his little property was situated) and ''the steam would be carried by electric waves in the atmosphere and give him a shock''; a neighbor gave him a lemon and he discovered that the skin was pierced and poison had been injected into it; he was visibly nervous, wild-eyed, distressed and irrational.  This, and much more, does not rest merely upon the oral evidence of witnesses, but is confirmed by a curious diary which the deceased kept in his own handwriting.  Extracts from that diary are as follows: ''Mr. Redmond received two electric needles in his foot (ball).  I got one while staking out.''  ''Sunday night placed 2 rose bushes in the ground and the next morning one was gone and a piece of paper in its place.''  ''About 15 years ago, a box of dynamite slid off a wagon on Larimer St. for no apparent reason whatever.''  ''About 1 years ago I was walking across a field and stepped on an iron scraper and fell over unconscious.  I felt a sharp pain back of my ear.''  ''A half loaf of bread fell off the bar overhead in the old cabin on the 1 acre piece.''

"When the papers rain out of the windows in the City Hall when no wind was blowing. I got an awful shaking up in bed one night sometime before I went to the springs." "Detected a small hole in cheese. When I ate the cheese it cleaned my head out." "The Violet Rays in the Mirror." "The Violet Rays in the Pillow." "The electric needle pricks at Wilber Springs." "A flash of hot air passed between Mother and me."

· In addition to this the circumstance that he left his little property away from his aged mother and from his brothers from whom he had not been estranged was proper for the consideration of the jury (*Field* v. *Shorb*, 99 Cal. 671, [34 Pac. 504]), as was also the fact that he met his death at his own hands. (*Estate of Dolbeer*, 149 Cal. 227, [9 Ann. Cas. 795, 86 Pac. 695].) The evidence was amply sufficient to support the verdict of the jury.

The decree and order appealed from are affirmed.

Melvin, J., and Lorigan, J., concurred.